**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Clarksburg Division**

ELECTRONICALLY
FILED
Dec 02 2022
U.S. DISTRICT COURT
Northern District of WV

MARY BETH CARDER,

            Plaintiff,

v.

TRANS UNION, LLC,

            Defendant.

Civil Action No. **1:22-CV-149 (Kleeh)** _____

## CLASS ACTION COMPLAINT

Plaintiff Mary Beth Carder, by counsel, files this Class Action Complaint against Defendant Trans Union, LLC ("Trans Union"). In support of her claims, Ms. Carder alleges:

## PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages; costs; and attorney's fees brought under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*.

2.      Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

3.      To accomplish Congress' goals, the FCRA contains several requirements to protect consumers, including §§ 1681c, 1681e(a), 1681e(b), and 1681i, which among the statute's cornerstone provisions.

4.      Absent several narrow exceptions, § 1681c prohibits consumer reporting agencies ("CRAs") from reporting adverse items of information that antedate the report by more than seven

years. This section of the FCRA "reflects a policy choice to allow dated adverse credit data to 'age off' a credit report because such information might otherwise indefinitely hamper the borrowing capabilities of now-reformed individuals." *Beseke v. Equifax Info. Servs. LLC*, No. CV 17-4971 (DWF/KMM), 2019 WL 6250756, at *3 (D. Minn. Nov. 22, 2019), motion to certify appeal denied, No. CV 17-4971 (DWF/KMM), 2020 WL 133289 (D. Minn. Jan. 13, 2020) (quoting *Seamans v. Temple Univ.*, 744 F.3d 853, 863 (3d Cir. 2014)). To further strengthen the protections of § 1681c, the FCRA also requires consumer reporting agencies to "maintain reasonable procedures designed to avoid violations" of § 1681c. 15 U.S.C. § 1681e(a).

5.      Along with these provisions, whenever a consumer reporting agency prepares a consumer report, § 1681e(b) requires it to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. *See* 15 U.S.C. § 1681e(b). This section imposes a high, and often disregarded, standard on credit reporting agencies. *See, e.g., Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b), and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived'" (quoting Webster's Third New International Dictionary 133, 1396, 1771 (1993)).

6.      Finally, to further protect consumers, the FCRA gives consumers the right to dispute the completeness or accuracy of any item of information in his or her file. *See* 15 U.S.C. § 1681i. This is one, if not the most, of the vital and effective protections of the FCRA.

7.      Section 1681i(a)(1)(A) sets forth the CRA's obligation whenever a consumer notifies a CRA that the consumer disputes the completeness or accuracy of information in the

consumer's file. When a CRA receives a consumer's dispute, it is obligated to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . ." 15 U.S.C. § 1681i(a)(1)(A). This investigation must be a "detailed inquiry or systematic examination" and cannot be superficial. *Burke*, 2011 WL 1085874, at *4 (quoting *Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 430 (4th Cir. 2004)).

8.      This case concerns Trans Union, a credit reporting agency, and its reporting of adverse and outdated information regarding Ms. Carder's home mortgage, which was being serviced by Shellpoint Mortgage Servicing ("Shellpoint"). Trans Union violated § 1681c because any adverse information associated with this account—the past due balance, the late payments, and the foreclosure notation—should have been removed from Ms. Carder's credit reports within seven years as required by the FCRA.

9.      Despite the FCRA's requirement that this information be removed from Ms. Carder's credit reports, Trans Union allowed Shellpoint to deceptively "re-age" the debt to make it appear as a newer debt. Trans Union knew or should have known that Shellpoint re-aged the debt because it had previously reported a delinquency for that same mortgage. But Trans Union allowed Shellpoint to continue to report derogatory information about this discharged debt much longer than permitted by the FCRA.

10.      As a result, Ms. Carder alleges class claims against Trans Union for violating §§ 1681c and 1681e(a). At a minimum, Trans Union should have removed the adverse information from Ms. Carder's file no later than June 2007 because of her bankruptcy discharge. Trans Union should also have maintained reasonable procedures designed to avoid the violations that occurred in this case, including a procedure prohibiting a furnisher from reporting this long-ago discharged

debt. This irrelevant and obsolete information caused Ms. Carder to be denied for credit, reputational damage, and other actual damages.

11.     Trans Union also should have known that the information that Shellpoint reported about Ms. Carder's mortgage was inaccurate because it was included in her Chapter 7 Bankruptcy, which was discharged in June 2000—an event that Trans Union included in Ms. Carder's file for years.

12.     Despite knowledge of Ms. Carder's bankruptcy, Trans Union did not use or maintain any procedures to cross reference Ms. Carder's bankruptcy filing with the Shellpoint mortgage to ensure that it continued to report as discharged in bankruptcy.

13.     And even after Ms. Carder disputed the inaccurate information with Trans Union and provided it with copies of her bankruptcy discharge, Trans Union failed to properly investigate her disputes and continued to report her as personally liable for the mortgage.

14.     Therefore, along with her class claims, Ms. Carder alleges individual claims against Trans Union under the FCRA, 15 U.S.C. §§ 1691e(b) and 1681i.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 168lp.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Ms. Carder's claims occurred in this District and Division.

## PARTIES

17.     Ms. Carder is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

18.     Trans Union is a foreign limited liability company doing business in West Virginia. Trans Union is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

**FACTS**

*Statutory Background*

19.     Congress enacted the FCRA for the express purpose of ensuring that consumer reporting agencies "exercise their grave responsibilities" in "a manner which is fair and equitable to the consumer, with regard to confidentiality, accuracy, relevancy, and proper utilization" of credit information. 15 U.S.C. §§ 1681(a)(4)-(b).

20.     Although many of the FCRA's provisions focus on accuracy, the FCRA also "aims to protect consumer information by limiting reporting periods for certain types of information to ensure only current and relevant information is disclosed." *Moran v. Screening Pros, LLC*, 943 F.3d 1175, 1186 (9th Cir. 2019).

21.     The FCRA's relevancy requirements, primarily located in § 1681c, accomplish Congress' overarching goal of providing consumers with an opportunity to improve their credit over time. *See* S. Rep. No. 91-517 (1969).

22.      Section 1681c prohibits consumer reporting agencies from furnishing reports containing outdated and stale information. This section prohibits CRAs from including eight categories of information in a consumer report.

23.     Relevant here, § 1681c(a)(5) is a catchall provision that prohibits the reporting "[a]ny other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years." 15 U.S.C. § 1681c(a)(5).

*Background and Facts Supporting the Class Claims*

24.     Because derogatory credit information is purged from credit reports after seven years, creditors often attempt to "re-age" a debt to make it appear as a newer debt, thereby preventing the purging of the debt from the consumer's report. John Ulzheimer, Born-Again Debt:

5

What Is Re-Aging, and Is It Legal? THE SIMPLE DOLLAR (Nov. 14, 2019) (https://www.thesimpledollar.com/credit/debt-collection/re-aging-debt-collection-accounts-illegal/?preview_id=65768) (explaining that "[r]e-aging occurs when the 'purge from' date on a derogatory account is changed to be more current than the date of the original default, resulting in the account hanging around on your credit reports longer than allowed under the law.").

25.     "Not only does the re-aging cause the negative credit report entry to remain on" the consumer's credit report longer than permitted by the FCRA, but it also "will most likely have an unfairly negative impact" on the consumer's credit score because "the item will be interpreted as being more recent and not in the distant past." *Id.*

26.     To re-age a debt, creditors typically change the "date of first delinquency" information, which is one of the standard data entry fields on all credit reports with the "Big 3" consumer reporting agencies.

27.     Upon information and belief, Trans Union, one of the Big 3 CRAs, has a procedure to suppress the reporting of this information when the date in the "date of first delinquency" field antedates the report by more than seven years.

28.     To prevent the suppression of the credit information, a creditor or debt collector simply needs to change the date in the "date of 1st delinquency" field to make it appear newer.

29.     In this case, representative of many others, Trans Union allowed Ms. Carder's creditor, Shellpoint, to update the date of first delinquency associated with her mortgage to allow negative credit information to remain on her report for longer than the FCRA allowed.

30.     Ms. Carder first became delinquent on her mortgage in the late 1990s.

31.     Later, Trans Union allowed Shellpoint to update the date of first delinquency associated with the mortgage to October 2019.

32.     Upon information and belief and as reflected by Ms. Carder's circumstances, Trans Union allows furnishers to change the date of first delinquency field without providing any explanation or justification for the change.

33.     Additionally, upon information and belief, Trans Union does not have any policy, practice, or procedure to ensure that it detects when a furnisher re-ages a debt even though Trans Union knows that it is a prevalent practice from creditors to re-age debts to keep these adverse items on consumers' reports.

34.     Trans Union knew or should have known that Shellpoint re-aged the debt when it changed the date of first delinquency to October 2019.

35.     Upon information and belief, Shellpoint re-aged the debt to keep the account on Ms. Carders' credit report for a longer period and coerce Ms. Carder into paying the amount outstanding on the loan.

36.     Trans Union's competitor has been sued for its failure to remove obsolete information from consumer credit reports. *Beseke*, 2019 WL 6250756.

37.     Upon information and belief, Trans Union is also well aware of the FCRA's obsolescence reporting requirements: it possesses FTC and other administrative guidance that advises it that it cannot report collection accounts more than seven years after the date of first delinquency.

38.     Despite this, Trans Union did not meaningful modify its procedures to ensure that it did not report obsolete information about Ms. Carder.

39.     Accordingly, Trans Union's violations of the FCRA were willful.

### *Ms. Carder's Individual Claims*

40.     In June 1995, Ms. Carder purchased her family home using a home mortgage loan

from Green Tree Financial Servicing Corporation.

41.     In early 2000, Ms. Carder filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Northern District of West Virginia, Bankruptcy Petition No. 1:00-bk-10437.

42.     Ms. Carder included her home mortgage loan in her bankruptcy filings.

43.     On June 21, 2000, the Bankruptcy Court entered an order, "Discharge of Debtor" that discharged Ms. Carder's legal liability on the home mortgage loan and her other debt obligations.

44.     Accordingly, Ms. Carder's home mortgage loan debt obligations were discharged in the bankruptcy proceeding.

45.     Upon information and belief, Shellpoint began servicing Ms. Carder's home mortgage loan after Green Tree's successor, Ditech, filed bankruptcy in 2019.

46.     In December 2020, Ms. Carder reviewed her credit reports and noticed that her mortgage account was reporting on her credit in a manner that was inaccurate and derogatory.

47.     For example, the mortgage tradeline did not reference that it had been included in bankruptcy.

48.     In addition, the mortgage was reporting with a status of "over 120 days past due," with a $6,821 past due balance and a total balance of $20,912.

49.     This information was incorrect. Ms. Carder was not past due on her mortgage and she did not have an outstanding balance because the debt had been discharged in bankruptcy more than two decades earlier.

50.     Trans Union published this information in her credit file, even though it was well past the seven-year period in which it was allowed to report this information.

51.     As explained above, Trans Union did not maintain reasonable procedures to prevent the reporting of this inaccurate information. For example, it did not cross reference Ms. Carder's prior bankruptcy filing with this tradeline, which would have demonstrated that the debt was too old to be reported.

52.     On December 23, 2020, Ms. Carder mailed a dispute letter to Trans Union disputing the incorrect information about her mortgage.

53.     This letter explained that her mortgage had been discharged in bankruptcy. She included a copy of the bankruptcy docket, along her with bankruptcy petition number.

54.     In response to Ms. Carder's disputes, Trans Union failed to conduct an adequate and substantive investigation.

55.     Instead, Trans Union relied entirely on Shellpoint's investigation and dispute response and took no independent action to investigate Ms. Carder's dispute, even though she sent documentation showing that the reporting about her mortgage was incorrect. As a result, Trans Union continued to report that Ms. Carder was personally liable for the mortgage and that the mortgage had a negative status.

56.     This information was still incorrect because Ms. Carder did not owe any money on her mortgage because it was discharged in her bankruptcy.

57.     On February 21, 2021, Ms. Carder mailed a follow-up letter to Trans Union, disputing its reinvestigation and notifying Trans Union to include her 100-word statement to future creditors regarding her ongoing dispute.

58.     Ms. Carder, in her brief statement, explained that the mortgage had been discharged and that the mortgage should not be reporting as past due, delinquent, or with an outstanding balance. She included a copy of her bankruptcy petition.

59.     Trans Union did not include the statement on her credit report.

60.     Next, Ms. Carder mailed a follow-up dispute letter to Trans Union in March 2021.

61.     Ms. Carder's dispute letter again explained that her mortgage had been discharged and that the mortgage should not be reporting as past due or with an outstanding balance. She included a copy of her bankruptcy petition and discharge.

62.     In response to Ms. Carder's disputes, Trans Union again failed to conduct an adequate and substantive investigation, and the inaccurate information remained on Ms. Carder's credit reports.

63.     As a result of Trans Union's conduct, Ms. Carder suffered significant actual damages, including a credit denial, reputational damage, decreased credit score, embarrassment, humiliation, and other emotional distress.

### Trans Union's Violations of §§ 1681e(b) and 1681i Were Willful

64.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).

65.     A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

66.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 418 (4th Cir. 2001); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

67.     A lack of any internal procedures to anticipate or prevent inaccuracy is also willful. *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 253 (4th Cir. 2017).

68.     Trans Union has received thousands of disputes and other complaints regarding Shellpoint tradelines—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

69.     Shellpoint has also been sued repeatedly for insufficiently investigating consumer disputes under the FCRA. Trans Union has been a co-defendant in many of these lawsuits. Even if it was not a co-defendant, many of these lawsuits are publicly available on PACER.

70.     Despite this notice, Trans Union continues to blindly accept Shellpoint's reporting and dispute investigations, even when that reporting contradicts the information in its own files or the information submitted by consumers about Shellpoint tradelines.

71.     For example, if Trans Union had reasonable procedures to assure the maximum possible accuracy of Ms. Carder's Shellpoint tradeline, it would have known that the account had been included in her prior bankruptcy filing.

72.     In fact, Trans Union has a long history of government enforcement actions, consumer complaints, and lawsuits establishing that it and the other national consumer reporting agencies systematically inaccurately report information related to debts discharged in Bankruptcy. *See, e.g.*, *White v. Experian Info. Solutions, Inc.*, Case No. 8:05-cv-01070 (C.D. Cal.); *Acosta v. Trans Union*, 243 F.R.D. 377, n.3 (C.D. Cal. 2007) (citing a bankruptcy lawyer's survey of approximately 900 clients found that 64% of TransUnion reports and 66% of Equifax reports erroneously list one or more discharged debts as due and owing).

73.     In *White*, Trans Union was the subject of a national court injunction requiring it to ensure that it did not report tradelines that were included in Chapter 7 discharges that were inconsistent with the information received in their public records data.

74.     Though that injunction is not governing as to the specific violations here, it certainly provided it actual notice sufficient to have predicted and prevented the inaccuracies addressed in this complaint.

75.     Despite the frequent inaccuracies related to accounts discharged in Bankruptcy, Trans Union continues to maintain unreasonable procedures regarding the way it publishes bankruptcy-related information.

76.     For example, Trans Union knew of Ms. Carder's bankruptcy discharge.

77.     However, upon information and belief, despite the abundance of notice available to Trans Union regarding the frequent errors in its bankruptcy related credit information, it does not independently review the information that it receives from its furnisher customers, like Shellpoint.

78.     Instead, Trans Union merely parrots the information about accounts included in bankruptcy that it receives from furnishers, without taking any additional steps to ensure that the accounts are updated after a consumer receives a discharge.

79.     Upon information and belief, Trans Union has actual knowledge of the problems associated with its systematic, erroneous reporting of one or more discharged debts as due and owing, yet it deliberately chooses to ignore these problems because reviewing or crosschecking the data would reduce its profits.

80.     Compounding this issue, as a standard practice, Trans Union does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the furnisher despite numerous court decisions admonishing this practice. *See*

*Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230–31 (D. N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

81.    Upon information and belief and consistent with its standard policies and procedures, Trans Union automatically generated its "investigation" results once Shellpoint verified the status of Ms. Carder's mortgage, and it did not take any additional actions to verify the accuracy of the information that the furnisher provided.

82.    Instead, Trans Union blindly accepted Shellpoint's version of the facts and continued to report the inaccurate, derogatory information on Ms. Carder's credit reports.

83.    Trans Union continues the practice of parroting the furnisher's response despite numerous lawsuits alleging (and establishing) that it fails to conduct a reasonable investigation under the FCRA.

84.    Trans Union does not intend to modify its dispute-processing procedures because doing so would drastically increase its operating expenses and hurt its profit margin.

85.    Therefore, at all times relevant to this Complaint, Trans Union's conduct was willful and carried out in reckless disregard for a consumer's rights under the FCRA. For example, its conduct was willful because it ran a risk of harm that was known, or so obvious it should have

been known, by failing to implement any procedure to identify and correct these common errors prior to furnishing reports.

**COUNT ONE:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681c(a)**
**(Ms. Carder's Class Claim)**

86.     Ms. Carder incorporates each of the preceding allegations.

87.     Under Federal Rule of Civil Procedure 23, Ms. Carder brings this action for herself and the following class:

> 1681c Class: All persons located in the United States (1) for whom Trans Union furnished a consumer report to a third party; (2) within the five years prior to the filing of this action and during its pendency; (3) containing adverse information regarding a  mortgage account; (4) where the servicer of the mortgage account changed the date of first delinquency; and (5) where the original date of first delinquency reported about the mortgage account antedated the report by more than 7 years.

> Ms. Carder is a member of the 1681c(a) Class.

88.     **Numerosity.** Fed. R. Civ. P 23(a)(1). Upon information and belief, Ms. Carder alleges that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Trans Union's internal business records, and they may be notified of the pendency of this action by published or mailed notice.

89.     **Predominance of Common Questions of Law and Fact.** Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether Trans Union was required by 15 U.S.C. § 1681c(a) to delete the information after 7 years; (2) whether Trans Union's conduct constituted a violation of the FCRA; and (3) whether Trans Union's conduct was willful.

90.     **Typicality.** Fed. R. Civ. P. 23(a)(3). Ms. Carder's claims are typical of the claims of each putative class member. Ms. Carder is entitled to relief under the same causes of action as the other putative class members. Additionally, Ms. Carder's claims are based on the same facts and legal theories as each of the class members' claims.

91.     **Adequacy of Representation.** Fed. R. Civ. P. 23(a)(4). Ms. Carder is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the other putative class members. Ms. Carder has retained counsel competent and experienced in class-action litigation and intends, with her counsel, to continue to prosecute the action vigorously. Ms. Carder and her counsel will fairly and adequately protect the class members' interests. Neither Ms. Carder nor her counsel have any interest that might conflict with their vigorous pursuit of this action.

92.     **Superiority.** Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Trans Union's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

93.     As described above, Trans Union failed to remove adverse information that clearly antedated the report by more than 7 years.

94.     Trans Union violated § 1681c(a) of the FCRA as to Ms. Carder and each of the class members by reporting each consumer's adverse information longer than seven years.

95.     Ms. Carder and each putative class member suffered real and actual harm and injury.

96.     For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Trans Union's files and reports.

97.     In each instance, each class member's credit report contained derogatory information that Trans Union was legally obligated to remove.

98.     Trans Union's conduct was willful, rendering it liable for statutory and punitive damages under 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Trans Union liable under 15 U.S.C. § 1681o.

99.     As a result of these FCRA violations, Trans Union is liable for statutory damages from $100.00 to $1,000.00 for Ms. Carder and each class member, punitive damages, attorney's fees, and costs under 15 U.S.C. § 1681n.

### COUNT TWO
### VIOLATION OF FCRA, 15 U.S.C. § 1681e(a)
### (Ms. Carder's Class Claim)

100.    Ms. Carder incorporates each of the preceding allegations.

101.    Under Federal Rule of Civil Procedure 23, Ms. Carder brings this action for herself and the following class:

> 1681e(a) Class: All persons located in the United States: (1) for whom Trans Union's records show that a furnisher changed the date of first delinquency on a mortgage account; (2) within five years prior to the filing of this action and during its pendency.

16

Ms. Carder is a member of the 1681e(a) Class.

102.   **Numerosity.** Fed. R. Civ. P 23(a)(1). Upon information and belief, Ms. Carder alleges that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Trans Union's internal business records, and they may be notified of the pendency of this action by published or mailed notice.

103.   **Predominance of Common Questions of Law and Fact.** Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether Trans Union maintained reasonable procedures designed to avoid violation of § 1681c; (2) whether Trans Union's conduct constituted a violation of the FCRA; (3) whether Plaintiff and the class members suffered concrete injuries; (4) whether Trans Union's conduct was willful; and (5) what is the proper amount of damages for Plaintiff and the class members.

104.   **Typicality.** Fed. R. Civ. P. 23(a)(3). Ms. Carder's claims are typical of the claims of each putative class member. Ms. Carder is entitled to relief under the same causes of action as the other putative class members. Additionally, Ms. Carder's claims are based on the same facts and legal theories as each of the class members' claims.

105.   **Adequacy of Representation.** Fed. R. Civ. P. 23(a)(4). Ms. Carder is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the other putative class members. Ms. Carder has retained counsel competent and experienced in class-action litigation and intends, with her counsel, to continue to prosecute the action vigorously. Ms. Carder and her counsel will fairly and adequately protect the class

members' interests. Neither Ms. Carder nor her counsel have any interest that might conflict with their vigorous pursuit of this action.

106. **Superiority.** Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Trans Union's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

107. Trans Union violated § 1681e(a) by failing to maintain any procedure to prevent furnishers from altering the information provided in the date of first delinquency field.

108. Upon information and belief, Trans Union allows furnishers to systematically change the date of first delinquency field without providing any explanation or justification for the change.

109. Additionally, upon information and belief, Trans Union does not have any policy, practice, or procedure to ensure that it detects when a furnisher re-ages a debt even though Trans Union knows that it is a prevalent practice from creditors and debt collectors to re-age debts to keep these adverse items on consumers' reports.

110.   Ms. Carder and the class members suffered concrete and particularized injuries because of Trans Union's violation in this case.

111.   Trans Union's conduct was willful, rendering it liable for statutory and punitive damages under 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Trans Union liable under 15 U.S.C. § 1681o.

112.   As a result of these FCRA violations, Trans Union is liable for statutory damages from $100.00 to $1,000.00 to Plaintiff and each class member, punitive damages, attorney's fees, and costs under 15 U.S.C. § 1681n.

**COUNT THREE:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681e(b)**
**(Ms. Carder's Individual Claim)**

113.   Ms. Carder incorporates each of the preceding allegations.

114.   Trans Union violated § 1681e(b) of the FCRA by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Ms. Carder.

115.   Because of Trans Union's conduct, Ms. Carder suffered actual damages, including credit denial, credit damage, and emotional distress.

116.   Trans Union's conduct was willful, rendering it liable for statutory and punitive damages under 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Trans Union liable under 15 U.S.C. § 1681o.

117.   As a result of its FCRA violations, Trans Union is liable for actual damages, statutory damages, punitive damages, costs, and attorney's fees under 15 U.S.C. § 1681n.

**COUNT FOUR:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681i(a)**
**(Ms. Carder's Individual Claim)**

118.    Ms. Carder incorporates each of the preceding allegations.

119.    Trans Union violated multiple sections of § 1681i, including: (1) failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate in violation of § 1681i(a)(1); (2) failing to provide Shellpoint with all the relevant information regarding Plaintiff's disputes in violation of § 1681i(a)(2); (3) failing to review and consider all relevant information submitted by Plaintiff in violation of § 1681i(a)(4); and (4) failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation of § 1681i(a)(5)(A).

120.    Because of Trans Union's conduct, Ms. Carder suffered actual damages, including credit denial, credit damage, and emotional distress.

121.    Trans Union's violations of § 1681i were willful, rendering it liable to Plaintiff for actual damages, statutory damages, punitive damages, costs, and attorney's fees under 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

WHEREFORE, Ms. Carder requests that the Court: (1) certify this matter to proceed as a class action; (2) award punitive and statutory damages for Ms. Carder's class claims as pled herein; (3) award attorney's fees, litigation expenses, and the costs of suit; (4) award actual, statutory, and punitive damages for Ms. Carder's individual FCRA claims; and (6) enter any other relief the Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**MARY BETH CARDER**

By: _____

Digitally signed by
Michael Nissim-Sabat
Date: 2022.12.02
13:48:42 -05'00'

Michael C. Nissim-Sabat (WV State Bar No. 12233)
Bren J. Pomponio (WV State Bar No. 7774)
Mountain State Justice, Inc.
1217 Quarrier Street
Charleston, WV 25301
Phone:  304.344.3144
Fax:     304.344.3145
Email: michael@msjlaw.org
Email: bren@msjlaw.org

***Counsel for Plaintiff***